AO 91 (rev.11/11) Criminal Complaint                                AUTHORIZED AND APPROVED DATE: _____ 8/13/17

# United States District Court
для the

WESTERN DISTRICT OF OKLAHOMA

FILED
AUG 13 2017
CARMELITA REEDER SHINN
CLERK U.S. DISTRICT COURT
BY _____ DEPUTY

United States of America )
)
v. )     Case No: M-17-368-STE
)
JERRY DRAKE VARNELL, )

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of August 11, 2017 to on or about August 12, 2017, in the Western District of Oklahoma, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 844(i) | Malicious attempted destruction of a building used in and affecting interstate commerce by means of an explosive. |

This criminal complaint is based on these facts:

See attached Affidavit of Special Agent, Eric A. Larsen, Federal Bureau of Investigation, which is incorporated and made a part hereof by reference.

☒ Continued on the attached sheet.

FILED
AUG 13 2017
CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY _____, DEPUTY

_____
Complainant's signature
Eric A. Larsen
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: Aug 13, 2017

City and State: Edmond, Oklahoma City, Oklahoma

_____
Judge's signature

SHON T. ERWIN, U.S. Magistrate Judge
Printed name and title

STATE OF OKLAHOMA            )
                             )
COUNTY OF OKLAHOMA COUNTY    )

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR COMPLAINT

I, Eric A. Larsen, Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), where I investigate violations of federal criminal law. I have been a Special Agent with the FBI since 2008. I am currently assigned to the Joint Terrorism Task Force of the Oklahoma City FBI office. During my career, I have conducted investigations involving violations of federal criminal law relating to, but not limited to, counterterrorism, national security, possession and use of weapons of mass destruction, and firearms-related offenses.

2. I have personally participated in the investigation set forth below. The facts in this Affidavit come from my personal observations, my review of documents related to this investigation, oral and written communications with others who have personal knowledge of the events and circumstances described herein, a review of public source information including information available on the Internet, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show there is sufficient probable cause for the requested warrant, but does not set forth all of my knowledge about this matter.

3. Based on my training and experience and the facts set forth in this Affidavit, I believe there is probable cause to believe **JERRY DRAKE VARNELL**, knowingly and intentionally committed the following offense against the United States, to wit: 18 U.S.C. § 844(i), malicious attempted destruction of a building used in and affecting interstate commerce by means of an explosive.

**In support thereof, your Affiant states the following:**

## INVESTIGATION TO DATE

4. On December 21, 2016, an FBI Confidential Human Source (hereinafter CHS-1), voluntarily provided to the FBI information that Jerry Drake Varnell (**VARNELL**), date of birth xx/xx/1994, SSN xxx-xx-4677, was aspiring to bomb the Federal Reserve Building in Washington D.C. in a manner similar to the Oklahoma City Bombing.[1] CHS-1 began cooperating with the government in January 2017, when he/she was interviewed by law enforcement agents. CHS-1 has a criminal history, and was serving a prison sentence for a probation violation at the time of his/her agreement to cooperate. CHS-1 has not been promised anything in exchange for his/her cooperation; however, monetary compensation has been provided during his/her continued cooperation. Information herein attributed to CHS-1, unless otherwise noted, was obtained by CHS-1 through his/her personal observations, conversations, and exchanges via electronic media, with **VARNELL**. Information provided by CHS-1 has been reliable and I am unaware of

---

[1] I believe, based on the totality of the investigation, that **VARNELL** was referencing the April 19, 1995, bombing of the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma, committed by Timothy McVeigh and Terry Nichols.

any false information provided by CHS-1. The information provided by CHS-1 has been corroborated through other investigative techniques including physical surveillance, consensually recorded conversations, administrative subpoenas, and searches of public records. CHS-1 stated he/she met **VARNELL** prior to December 2016. CHS-1 advised that **VARNELL** was upset with the government and was seeking retaliation. Additional CHS-1 reporting indicated **VARNELL** was in possession of firearms and desired to develop and arm a small militia group.

5.    During an interview with CHS-1 on April 3, 2017, he/she reported that he/she had previously communicated with **VARNELL** via "TextLock."[2] CHS-1 provided screenshots of four conversation strings he/she had with **VARNELL**. These were messages previously reported by CHS-1 to FBI as referenced in paragraph 4 of this Affidavit. According to CHS-1, as partially corroborated by the screenshots, **VARNELL** claimed to have a bunker for when the world (or United States) collapsed. **VARNELL** was in the process of outfitting the bunker with supplies. **VARNELL** indicated he was still trying to build his "team." **VARNELL** wrote to CHS-1, "I'm out for blood. When militias start getting formed I'm going after government officials when I have a team." **VARNELL** also discussed the possibility of using explosives as part of his plan when he wrote, "I think I'm going to go with what the okc bomber used. Diesel and anhydrous ammonia. I might have to make a distillery to process some stuff but[.]"

---

[2] "TextLock" is an encryption application (app). This app takes a normal text and encrypts it. The sender and receiver need to know the proper "key" for the app to then decrypt or decode the message.

3

6. On April 17, 2017, CHS-1 reported further communications with **VARNELL** via Facebook private messenger, which CHS-1 preserved and provided to law enforcement. During the communication, **VARNELL** indicated he did not have his "team" put together yet. **VARNELL** claimed people were too complacent and didn't have "balls." During the exchanges, CHS-1 told **VARNELL** that he/she (CHS-1) needed **VARNELL**'s address. **VARNELL** wrote, "XXXXXXXXXXXXXXX, sayre, ok, 73662[.]"[3]

7. On April 24, 2017, CHS-1 met with **VARNELL** at his (**VARNELL**'s) residence, XXXXXXXXXXXXXXXXX, Sayre, Oklahoma.[4] CHS-1 reported that he/she had been in contact with **VARNELL**, who was utilizing cellular target telephone number (XXX) XXX-XXXX (TT1).[5] A consensually monitored audio recording was made of the conversation had between CHS-1 and **VARNELL** during their meeting. According to CHS-1, the property has two main structures. The first is a house where **VARNELL** lives with his mother, stepfather, and sister. The second is a new house under construction.

---

[3] The address provided to CHS-1 and the address of the residence that **VARNELL** is currently living has been previously documented and is redacted in this Affidavit, as it is not relevant for the purpose of probable cause to charge **VARNELL** with the listed crime.

[4] The address provided by **VARNELL** in paragraph six is a different address than the address listed in this paragraph and in the remainder of the Affidavit. The address referred to in paragraph six does check to an individual with the last name Varnell. However, I believe, based on the totality of the investigation, that this is an address that **VARNELL** used to reside and no longer resides. The address referred to in paragraph seven and in the rest of the Affidavit referred to as **VARNELL**'s residence checks to **VARNELL**'s father. CHS-1 and an undercover FBI employee, identified later in this Affidavit as UCE, have been to **VARNELL**'s residence referred to in this paragraph and confirmed that it is in fact where he is living.

[5] TT1 is the only telephone number that I am aware of **VARNELL** utilizing through the course of this investigation.

4

CHS-1 also observed on the property a "bunker," which CHS-1 described as a large storage container box buried on three sides. FBI has been able to corroborate the presence of these three structures. **VARNELL** indicated to CHS-1 this was a "multipurpose" bunker with food and supplies. In the new house, **VARNELL** said he created a hidden room, which will be concealed behind a bookcase. **VARNELL** claimed he would use this area to hide and grow marijuana. CHS-1 observed one marijuana plant in the room.

8. CHS-1 reported **VARNELL** continued to use encrypted applications (apps) and private Facebook messaging as part of his operational security mindset. Prior to April 25, 2017, CHS-1, at the direction of FBI, advised **VARNELL** that he/she knew of a person with access to large quantities of ammonium nitrate and experience in explosives. On April 25, 2017, **VARNELL** sent CHS-1 an encrypted message via "TextLock" in reference to ammonium nitrate. **VARNELL** wrote, "Well if shits ready to go I'm ready to go. Let me work out some chemistry with the ammonia your dude has." CHS-1 provided law enforcement with a screen shot of the communication with **VARNELL**.

9. On May 10, 2017, CHS-1 met with **VARNELL** at **VARNELL**'s residence in Sayre, OK. **VARNELL** was accompanied by a female friend, and claimed they had been on a two-day "dope binge" with weed and meth. **VARNELL** said it was cool because they got a bunch of stuff accomplished. This meeting was audio recorded. During this meeting, CHS-1 told **VARNELL** that he/she (CHS-1) had access to anhydrous ammonia and ammonium nitrate through a friend. **VARNELL** told CHS-1 that he (**VARNELL**) was only interested in ammonium nitrate due to its nitrogen content, which was more reactive and could be used to make a nitrogen bomb. CHS-1 and **VARNELL** discussed

5

the Eccles Federal Reserve Building in Washington D.C., and that it had five stories above ground and one story below ground. **VARNELL** said he was unsure how many offices or people the building held. **VARNELL** and CHS-1 agreed they would discuss it further at a later date.

10. On May 17, 2017, CHS-1 met with **VARNELL** at **VARNELL**'s residence in Sayre, OK. **VARNELL** was again accompanied by a female friend. This meeting was audio recorded. On this occasion, **VARNELL** took CHS-1 to the "Bunker" where CHS-1 observed furniture and other items. CHS-1 advised law enforcement the bunker had power running to it, and lights on. **VARNELL** talked about needing 1,000 pounds of ammonium nitrate for a bomb big enough for a five-story building. CHS-1 believed **VARNELL** was referring to the Eccles Federal Reserve Building in Washington D.C. **VARNELL** talked about needing a "catalyst," or something to get the best or most powerful explosion. CHS-1 tried to get **VARNELL** to explain if this was a fuel or primary explosive, but **VARNELL** was vague. **VARNELL** also stated the device would need to be placed into a van and then parked somewhere. **VARNELL** discussed the price of ammonium nitrate, which he (**VARNELL**) believed he could get in bulk, $150 for 600 lbs. **VARNELL** believed a van should be rented close to the target site and set with a remote timer. **VARNELL** said he thought CHS-1 should write a program or an app that would be downloaded on an android phone. The app would allow remote detonation of the device. **VARNELL** said he thought matchsticks and acetone would be needed for the ignition source, and he indicated they would need a bunch of wire, likely copper wire. **VARNELL** stated he had been thinking about data centers. **VARNELL** said these would be easy to find as they were all over.

VARNELL said these data centers are owned by corporations and hold server farms. VARNELL claimed if someone could find the Facebook data farm, they could shut it down for a while. At one point CHS-1 told VARNELL that he/she was concerned about VARNELL's female friend being present. When CHS-1 pressed the issue, VARNELL stated, "Get me the fucking ammonium nitrate, that's all I need." CHS-1 questioned if VARNELL needs the acetone and the matches. VARNELL stated, "yes, lots of matches, possibly thousands of matches." CHS-1 and VARNELL discussed building the device away from VARNELL's house, but did not discuss where. VARNELL stated he needed to do some more research, finding something that mixes well with the ammonium nitrate. VARNELL thought there was always something you could do to make a better bang. VARNELL also thought that if they had the "explosives, like caps," they could make it work that way. I believe this last statement to be in reference to blasting caps, which is a commercially available high explosive.

11. On May 24, 2017, CHS-1 engaged in private message contact with VARNELL via Facebook Messenger utilizing "TextLock." Portions of the communication were preserved with screen shots. During this communication, VARNELL indicated he wanted to target BancFirst instead of his original target of the Eccles Federal Reserve Building. CHS-1 asked why VARNELL had selected BancFirst. VARNELL responded, "Well I don't wanna kill a bunch of people [.]" When questioned as to which BancFirst, VARNELL responded "Idk."[6] During this communication, CHS-

---

[6] I believe this to be a commonly used acronym in texting or messaging, meaning "I don't know."

7

1 suggested that "the professor" might accompany CHS-1 when CHS-1 would be meeting with **VARNELL** the following week. CHS-1 arranged to meet with **VARNELL** the following week to discuss the plan further.

12. On May 31, 2017, Agents met with CHS-1 and FBI Undercover Employee (hereinafter "UCE")[7] together. CHS-1 made telephone and encrypted message contact with **VARNELL**. **VARNELL** indicated he was prepared to meet with the "Professor" the following day. **VARNELL** wanted to meet CHS-1 and the "Professor" at a restaurant in Sayre, Oklahoma, to discuss the acquisition of ammonium nitrate and explosives.

13. On June 1, 2017, CHS-1 met with **VARNELL** at **VARNELL**'s residence. This was audio/video recorded. **VARNELL** was staying in a camper trailer positioned on the southwest section of the property. CHS-1 advised that the trailer had power, water, and used the Wi-Fi from **VARNELL**'s parents' house. **VARNELL** claimed he once stayed in another house on the same property, but in January 2017, he burned it down for insurance money. Later the same day, CHS-1 and **VARNELL** drove to Elk City, Oklahoma so **VARNELL** could meet the "Professor."

14. On June 1, 2017, CHS-1 introduced UCE, aka "Professor," to **VARNELL**. This meeting took place at a restaurant in Elk City, Oklahoma, and was audio/video recorded. During this meeting **VARNELL** admitted to holding "III% ideology" and

---

[7] FBI Undercover Employee (UCE) would hereinafter be acting as the "Professor" during future meetings with **VARNELL**.

8

wanting to start the next revolution.[8] **VARNELL** said he wanted to be a part of something, and was of the same mind with people who wanted to use explosives and make a statement. **VARNELL** stated, "something needs to be done," but killing a bunch of people was never a good idea. **VARNELL** referenced the movie *Fight Club* when he discussed wanting to take down a government facility or other structures.[9] **VARNELL** stated, "That's the kind of shit I want to fucking do, it's time to do that kind of fucking shit", although CHS-1 believed **VARNELL** had not selected a specific target yet. **VARNELL** indicated that he had previously made homemade explosives. UCE told **VARNELL** that he should stop handling any explosives that he already has so that he does not accidentally detonate any causing himself injury and drawing unwanted attention by others asking questions about the explosives. **VARNELL** agreed to have the "Professor" (UCE) obtain the needed explosives in lieu of making it himself. **VARNELL** claimed he would obtain a false identification card to rent a van or box truck to transport the device. CHS-1, UCE, and **VARNELL** agreed to meet again, at which point he (**VARNELL**) would select a target. **VARNELL** provided UCE with telephone number (XXX) XXX-XXXX (TT1) as a means to contact **VARNELL**. Since the introduction of UCE to **VARNELL** on June 1, 2017,

---

[8] According to Wikipedia, "The Three Percenters (also styled "3%ers") is an American "patriot movement" which pledges resistance against the United States government regarding infringement of the United States Constitution. The name is based on the incorrect belief that the American Revolutionary military was comprised of three percent of the colonial population. The group's stated primary purpose is to protect constitutional rights . . . ."

[9] The protagonist in *Fight Club*, Tyler Durden, desires to "erase debt by destroying buildings (by means of explosives) that contain credit card companies' records." *Id.*

9

UCE has had two additional face-to-face meetings with **VARNELL**, as well as multiple communications via cell phone (**VARNELL** utilizing TT1), text, Facebook messenger, and encrypted application "TextLock."

15. On June 21, 2017, CHS-1 communicated via Facebook Messenger utilizing "TextLock" with **VARNELL**. CHS-1 provided screenshots of these messages. **VARNELL** stated "Bank of America data center is vulnerable in [XXXXXXXXXX] texas [,]" "IRS dpt in Maryland looks pretty weak. It says they do most of their data shit there[,]" "I'm thinking we should do a couple buildings at once. Or right after another. In the span of a day[,]" and "I'd need pictures and shit to get them. And I'm a broke fuck." CHS-1 believed **VARNELL** was in the process of picking his targets for bombing.

16. On June 26, 2017, UCE met with **VARNELL** face-to-face. UCE asked **VARNELL** what he was thinking about potential target locations for the explosive device. **VARNELL** advised UCE that his most current thought on a target location was an IRS building in Texas. **VARNELL** stated he had not recently spent a lot time on the computer and, therefore, needed to continue to research targets. **VARNELL** indicated it was important the federal government be connected to the target location in some manner.

17. On July 13, 2017, UCE met with **VARNELL** face-to-face to conduct a pre-operational surveillance of potential target locations. The meeting was audio/video recorded. UCE drove them from **VARNELL**'s house to Oklahoma City. During the trip from his trailer to Oklahoma City, **VARNELL** stated he had water barrels they could use but would prefer to look for some other type of container. **VARNELL** further stated he believed he might be able to secure a vehicle from a relative. After arriving in Oklahoma

City, UCE and **VARNELL** first traveled to the area of the BancFirst building, located at 101 N. Broadway, Oklahoma City, Oklahoma. At that location, UCE and **VARNELL** exited the vehicle and proceeded on foot around the block which houses the BancFirst building. **VARNELL** noted a potential location for the device in an alley adjacent to the BancFirst building. **VARNELL** emphasized they needed a way to get his message out to ensure that no other group, such as ISIS[10], was able to take credit for the attack. **VARNELL** was asked if he was sure he wanted to conduct this attack, and he responded in the affirmative. **VARNELL** stated he did not believe UCE understood the depth of **VARNELL**'s hatred for the government.

18. On July 19, 2017, CHS-1 met with **VARNELL** at his trailer. This meeting was audio/video recorded. **VARNELL** had expressed wanting to send a Facebook message about his plan. CHS-1 inquired about what information **VARNELL** wanted in his Facebook message. **VARNELL** suggested sending a message similar to advertisements people receive on their timelines.[11] CHS-1 requested **VARNELL** send him the message once he developed it. **VARNELL** wanted the message to be in reference to

---

[10] ISIS is known to release public statements taking credit for terroristic attacks globally.

[11] Facebook Timeline "is where [a user] can see [their] posts or posts [they] have been tagged in displayed by date. [The user's] Timeline is part of [the user's] profile. [A user] can post to [their] Timeline either from the top of their Timeline or from News Feed." *How do I post to my Timeline?*, https://www.facebook.com/help/170116376402147.

"News Feed is the constantly updating list of stories in the middle of [the user's] home page. News Feed includes status updates, photos, videos, links, app activity and likes from people, Pages and groups that [the user] follow[s] on Facebook." *How New Feed Works*, https://www.facebook.com/help/327131014036297/.

"freedom". **VARNELL** stated he lived on his parent's property for free, and just helped out on the ranch and on the new house. **VARNELL** had access to the parents' house when they were not home and allowed CHS-1 to use the bathroom in the parents' house on this occasion. **VARNELL** also advised he had not been able to get a truck for the bombing yet.

19. During UCE's contact with **VARNELL**, he/she has repeatedly questioned **VARNELL** regarding his intention and willingness to proceed with a bombing. The following are specific exchanges between UCE and **VARNELL**:

    a. On June 1, 2017, UCE questioned **VARNELL**'s desire to conduct a bombing, and **VARNELL** affirmed those intentions.

    b. On June 26, 2017, UCE questioned **VARNELL**'s desire to conduct attacks on two separate locations. **VARNELL** expressed that this was part of the idea to do something that made an impact. **VARNELL** mentioned conducting a second attack three to four hours after the initial attack.

    c. On July 13, 2017, UCE advised it was **VARNELL**'s plan, and UCE would assist him as necessary. UCE advised **VARNELL** that if he was not interested in proceeding, UCE would cease with no hard feelings. **VARNELL** agreed to proceed with the planning.

20. During UCE's contact with **VARNELL**, UCE has repeatedly indicated a bombing would likely result in the loss of life, even if unintentional. The following are specific exchanges between UCE and **VARNELL**:

    a. On June 1, 2017, UCE advised people would likely be killed. **VARNELL** agreed it was a possibility.

b. On June 26, 2017, UCE advised **VARNELL** of the possibility of killing one or more people located within the target location. **VARNELL** acknowledged this possibility and stated, "...you got to break a couple of eggs to make an omelet... that's why people don't do this shit because, you know, you got to be able to overcome that little reality there[.]" **VARNELL** commented he wanted to do something that would, "somehow cripple the government. Something that sends a message that says, 'You are a target.'"

c. On July 6, 2017, during a text conversation **VARNELL** indicated he wanted to conduct the attack after closing hours to prevent casualties. UCE acknowledged the idea, but reminded **VARNELL** there was still a chance. **VARNELL** stated, "I'm down for whatever. Safety is number one."[12]

d. On July 13, 2017, UCE discussed with **VARNELL** the potential for employees or cleaning staff to be in the BancFirst building during the bombing, and they could be killed or injured in an explosion. **VARNELL** acknowledged he understood the risks.

21. On August 9, 2017, CHS-1 communicated via Facebook Messenger utilizing "TextLock" with **VARNELL**. CHS-1 provided screenshots of these messages. **VARNELL** sent CHS-1 the following message to be posted on Facebook once the bombing was completed: "What happened in Oklahoma city was not an attack on America,

---

[12] Based on UCE's conversations with **VARNELL**, as well as UCE's knowledge of the investigation, UCE believes **VARNELL**'s comment that "safety is number one" is a reference to **VARNELL**'s own safety, and not that of potential victims.

13

it was retaliation. Retaliation against the freedoms that have been taken away from the American people. It was a wake up call to both the government and the people. An act done to show the government what the people thinks of its actions. It is also a call to arms, to show people that there are still fighters among the American people. The time for revolution is now." This message was sent by **VARNELL** to CHS-1 for CHS-1 to post to Facebook after the bombing in a manner that would not trace back to anyone involved and for the purpose referenced in paragraph 17 of this Affidavit.

22. On August 11, 2017, UCE met with **VARNELL** face-to-face to conduct the building of a Vehicle Borne Improvised Explosive Device (VBIED), pre-operational surveillance of the target location, and the final delivery of the VBIED to the target location, BancFirst located at 101 N. Broadway, Oklahoma City, OK. The meeting was audio/video recorded. UCE met with **VARNELL** at his residence in Sayre, OK, and drove them from the residence to a mini-storage unit in El Reno, Oklahoma. At approximately 6:30 pm, **VARNELL** actively participated in building what he believed to be a 1,000-pound VBIED constructed of ammonium nitrate/fuel oil (ANFO), detonating cord, cast boosters, dynamite, and blasting caps. All of these items were inert and were provided to **VARNELL** by UCE. The VBIED was loaded into what **VARNELL** believed to be a stolen cargo van. At approximately 9:17 pm, **VARNELL** and UCE conducted a final rehearsal of the route to the target location. Once completed, **VARNELL** and UCE returned to El Reno. At approximately 12:05 am on August 12, 2017, **VARNELL** alone, and believing himself in possession of a VBIED, drove the cargo van, which he believed to be stolen, containing the VBIED from El Reno, Oklahoma to Oklahoma City, Oklahoma, through

the streets of downtown Oklahoma City, toward his planned target location. At approximately 12:40 am, **VARNELL** entered the alley/loading dock adjacent to the BancFirst building located at 101 N. Broadway and parked the vehicle. While in route, **VARNELL** had armed the device's time and power unit (TPU) by inserting the TPU key. Once stopped, **VARNELL** ensured the attached cell phone was powered on, and ensured the power wires to the TPU were securely fastened. **VARNELL** then exited the vehicle, and left the area on foot. **VARNELL** walked to where FBI UCE was parked and got into the vehicle. FBI UCE drove several miles away so **VARNELL** could remotely detonate the VBIED via cell phone. **VARNELL** did not want to use his own cellular telephone to detonate the device for fear that it would be traced back to him. **VARNELL** was aware that FBI UCE had a "burner phone" and stated that he was willing to dial the number from the "burner phone." **VARNELL** then dialed the cell phone number, which he believed would detonate the VBIED parked near his selected target. The phone number **VARNELL** dialed rang to a phone in possession of law enforcement. When **VARNELL** did not witness a detonation of the VBIED, he dialed the number at least two more times. **VARNELL** was placed under arrest at approximately 12:54 am by agents of the FBI, Joint Terrorism Task Force, and other assisting law enforcement officers.

23. Based on the aforementioned information, I believe there is probable cause to believe that Jerry Drake Varnell committed the crime of malicious attempted destruction of a building used in and affecting interstate commerce by means of an explosive, in violation of 18 U.S.C. § 844(i). It is therefore requested that an arrest warrant issue for the offense listed above.

FURTHER YOUR AFFIANT SAYETH NOT.

_____
Eric A. Larsen
Agent, FBI Oklahoma City

Sworn to before me this __13th__ day of __August__, 2017

_____
SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE